VAN LONKHUYZEN *v.* DAILY NEWS CO.

1. LIBEL AND SLANDER—JUSTIFICATION—RES JUDICATA.
   On a former hearing of this cause (195 Mich. 283), this court held that the words complained of were libelous *per se,* and that whether they were justified—excused, warranted—because they were fair comment was a question for the jury.

2. SAME—MATTERS OF PUBLIC INTEREST—CRITICISM.
   Where plaintiff published an article upon a matter of current public concern, criticising action of public officials, comment and criticism from those who held other views were invited or at any rate excused.

3. SAME—BURDEN OF PROOF—FAIR COMMENT—QUESTION FOR JURY.
   The *onus* is on plaintiff, where a defense of fair comment is raised, just as in any other case, to show that the

words are reasonably capable of being understood as a libel on him, and it is for the judge to say whether the published article is capable in law of being a libel, and, the court having determined this point favorably to the plaintiff, then whether the words complained of are, or are not, fair comment, is essentially a question for the jury.

4. SAME—RIGHT TO CRITICISE—NEWSPAPERS—PRIVILEGE.

In making the defense of fair comment, defendant had no benefit of privilege; the liberty of the press, unless affected by statute, being no greater and no less than the liberty of every citizen; it is the right of every one, not the privilege of any particular one, to comment fairly and honestly on any matter of public interest.

5. SAME—TRIAL—INSTRUCTIONS.

. The court should have instructed the jury that the article in question is libelous unless it is fair comment, and that whether or not it is fair comment was for them to decide, under proper instructions.

6. SAME—EVIDENCE—REPETITION OF LIBEL—MALICE—DAMAGES.

Evidence of repetition of the libel before suit was begun is admissible in aggravation of damages, and repetition after suit began and after a first trial may be proved as evidence of malice if the publication is not found to be in fact fair comment.

7. SAME—EVIDENCE—SELF-SERVING EVIDENCE.

It was error to admit in evidence, as tending to rebut malice, an editorial headed "Dr. Van Lonkhuyzen," printed in defendant newspaper after the first trial of the case was ended in the circuit, since if regarded as favorable to defendant, it is self-serving evidence made by defendant in its own behalf, and is not in the "same class" as other articles published by defendant after the publication of the alleged libel, and offered by plaintiff to show malice.

Error to Kent; Perkins, J.  Submitted October 16, 1918.  (Docket No. 56.)  Decided December 27, 1918. Rehearing denied May 1, 1919.

Case by John Van Lonkhuyzen against the Daily News Company for libel.  Judgment for defendant. Plaintiff brings error.  Reversed.

_Dorr Kuizema_ and _Smedley & Linsey,_ for appellant.

*Norris, McPherson, Harrington & Waer,* for appellee.

Upon a former trial of this cause, a judgment for the defendant, entered upon a verdict directed for defendant, was reversed and a new trial granted. 195 Mich. 283.

There are two special defenses of which notice was given, one, justification, that—

"The statements contained in the article entitled 'Playing with Fire' published by defendant in the Grand Rapids News on July 2, 1915, and alleged in plaintiff's declaration to be libelous, are true";

*second,* a privilege, or qualified privilege, in publishing the alleged libelous article. The defense of privilege relied upon is pleaded in the following form (it is called by defendant notice of the defense of privilege) :

"That the conduct and motives of the said plaintiff and his acts and doings in composing and publishing in said 'De Wachter' the said article, 'Spelen Met Vuur,' and in causing the same to be widely circulated throughout the United States among the citizens thereof, and in instigating the composition of the said communication addressed to the President of the United States, and in causing said communication to be published in said 'De Wachter' as aforesaid, and to be widely circulated among American citizens generally, with the view and purpose of obtaining signatures of such citizens to said communication, and with the view and purpose of presenting the said communication to the President with such signatures, for the purpose and with the intent of influencing the government of the United States to act along the lines suggested in said communication were all believed by said defendant to amount to disloyalty to the government of the United States, and to threaten the peace, neutrality and welfare of the nation; and the said acts and doings of the said plaintiff as aforesaid, and the matters therein involved, concerning which the

said alleged libelous article was written and published by the said defendant, were matters of great importance and of interest to all citizens of the United States and to the nation, and involved the welfare of American citizens generally, which American citizens could only be communicated with through the public press, and the acts, doings and motives of said plaintiff as aforesaid were the proper subject of discussion in the public press, and the said defendant believed, and does believe, that the said acts and doings of the said plaintiff, and the movement sought to be instigated thereby, amounted to a public misfortune and a serious injury to the community and the American citizens in general, and the defendant, so believing, in the said article alleged by plaintiff to be libelous, discussed the said plaintiff's said acts and doings and his conduct and motives in and about the same in good faith, and without malice, and made only such statements, observations and deductions in regard thereto as it believed, on due inquiry and reasonable grounds, and under the circumstances, to be true and just, and warranted by the acts and doings of said plaintiff."

It appears from the record of the case made at the former trial that defendant offered no testimony except as its manager was called by the plaintiff for cross-examination and gave testimony, that argument followed the making of the motion by defendant for a directed verdict, in the course of which counsel for plaintiff stated that the court must not infer from what had been said in argument that there was not, or might not be, a question of fact for the jury upon the question of privilege. In advising the jury of his conclusions, the trial court said, among other things:

"There has been a motion made to take this case from the jury and direct a verdict for the defendant on the ground that the words used by the Daily News Company were not libelous and that the Daily News Company were justified in printing what they did print in view of what Dr. Van Lonkhuyzen had issued in his paper called De Wachter, an argument has been

made, and it is the court's view of the matter that the motion is well based and that you should be directed to return a verdict for the defendant without any further consideration of the case." &ast; &ast; &ast;

The reasons so assigned by the court were challenged in this court by the plaintiff and appellant, who in the brief and in argument discussed them under the heads, (1) Was defendant's article libelous *per se,* and (2) Were defendant's words justified, and, aside from discussion of exceptions based upon rulings made by the court in admitting and rejecting testimony, were the points, and only points, urged. The defendant, in the brief, discussed these two principal points only, reversing the order and contending, *first,* that "the publication was justified," and, *second,* that "the publication was not libelous."

Under the first of these heads, it was argued, without reference to authority, that—

"It must be conceded that the editorial complained of contained a full and fair statement of all the facts upon which its inferences and deductions were based. It stated (1) that appellant was an alien owing no allegiance to the American flag; (2) that he had not taken out his first naturalization papers or signified his intention of so doing; (3) that he had instigated the circulation of a protest among Holland-Americans generally; (4) which protest rings throughout with dissatisfaction and doubt of President Wilson's motives, and criticises him for the kind of diplomacy he has adopted in dealing with the question of German encroachments on American commerce.

"None of these facts could either be disputed or complained of by appellant whose only complaint is that the inferences and deductions which the appellee drew as to the significance and effect of such acts and doctrines were not justified by the facts set forth in the editorial.

"The Daily News expressed the opinion that an alien is not rightfully privileged to influence American citizens in their conduct of American public affairs;

and that when such a one chooses a time of great stress and tension, when a crisis impends in which only great unanimity of public sentiment and loyalty to the government may avert war, to procure one great class of our citizens to make a public, organized assault upon the good faith and fairness of our officials in the conduct of diplomatic negotiations relating to such crisis, then that alien is not only a busybody, a meddler, and a spreader of distrust, discontent, and dissatisfaction in our government, but is a spreader of un-Americanism and sedition.

"It occurs to us, as it did to the trial court, that a political rather than a legal question is here involved, and that it requires nothing more than the instinct of American patriotism to judge as to the correctness of the appellee's estimate of the appellant's public conduct in taking the startling action that he took at such a peculiarly inappropriate time.

"We respectfully submit that the trial court did not err in holding the publication justified on the admitted facts, and that the verdict was properly directed."

Under the second head, it was argued, in part:

"The defendant dealt with the significance of appellant's political doctrine and neither attacked private character nor left doubt as to the basis of fact upon which its conclusions were based, whereby any person reading the article could assume that the defendant had other grounds for its conclusions than that which it had set up, or that private character was being commented upon. The defendant's agents were not even acquainted with the plaintiff. Any person reading the article had all the facts upon which it was based before him. He was not bound to draw the same inferences therefrom which the defendant had drawn, but was at liberty to draw his own inferences and conclusions and agree or disagree with the logic of the defendant, as he saw fit.

"Libel arises out of a false statement of fact and not from the inferences which may be logically drawn from a full, fair and true statement of fact, however uncomplimentary or unpleasant the inferences may be, and the defendant, after fully and fairly stating all of the pertinent facts in regard to the case, cannot be charged with libel for merely setting forth sincere

and reasonable inferences and conclusions which follow therefrom."

It was decided, (1) that the court was in error in ruling that the language, a portion of which was,

"The Rev. Mr. Van Lonkhuyzen is an interloper, a meddler, and a spreader of distrust, discontent and sedition,"

was not libelous *per se,* and (2) that it could not be determined as matter of law that the libelous language was *justifiable.* It is also said, in the opinion:

"In the case before us, the publishers were not satisfied to state the facts and allow the readers to draw their own conclusions, but followed it up by making the libelous statement for the very purpose, as admitted, to hold him up to scorn and ridicule. While the question of whether or not the limits of fair criticism have been transcended may sometimes be a question of law, ordinarily it is a question of fact for the jury, and we are satisfied that under all the facts and circumstances of this case the question of justification became one of fact for the jury to determine."

No question of privilege, or qualified privilege, was suggested, or debated, by counsel, as a question for decision by this court.

Upon a second trial, a jury returned a verdict for defendant, upon which judgment was entered. Plaintiff, appellant, states in the brief that the evidence produced at both trials was substantially the same and refers, for a statement of the facts, to that made by this court on the former appeal. He adds, however, the following:

"The defendant did not have any personal acquaintance with plaintiff at the time of the printing of the libelous editorial, and,

"On July 29th, after defendant was sued, it caused a reprint of the editorial to be published on the first page of its paper."

Appellee adds to this reference and statement of

facts the following excerpt from the testimony of defendant's manager:

"*Q.* State to the jury what your purpose was in writing—strike it out.   In causing to be published this article in your paper, this editorial of July 2, 1915.

"*A.* For the purpose of stopping the circulation of a dangerous doctrine, at a critical time, because it was my duty as the head of this newspaper to comment on subjects of importance to the people and the nation at that time, for the purpose of stopping just such demonstrations as we are having at the present time.   *   *   *   Furthermore, for the purpose of doing what I thought was my duty, understanding as I did conditions in other lands and the conditions in this country.   *   *   *

"*Q.* You claimed and now claim that the issue involved was one of some national importance, did you not?

"*A.* I do.   *   *   *

"*Q.* Whether they were true or untrue, they injure a man's standing just the same, do they not?

"*A.* I never knew the truth to injure any man's standing.   Did you?

"*Q.* I have heard of such things, but you wanted it to be understood by all the readers of your paper throughout Michigan that this man was an alien busybody?

"*A.* As referring to his views, yes, sir; political views, his propaganda and his doctrines.

"*Q.* You didn't so state when you wrote the newspaper article?

"*A.* Oh, that is all we talked about.   You will find no reference in the article to Dr. Van Lonkhuyzen's personal standing and character.

"*Q.* So now you believe his personal standing is not injured at all?

"*A.* I would not think so.

"*Q.* Now, you knew that by commenting the way you did, it would offend Mr. Van Lonkhuyzen, didn't you?

"*A.* Yes, I knew that.

"*Q.* And you knew it would be doing him as much

damage as any one could with reference to his reputation and feelings?

"*A.* In connection with the subject."

And the following:

"Mr. Johnson, the publisher, and Mr. Etten, the editor of defendant's paper, were not personally acquainted with plaintiff and had no hatred or ill-will toward plaintiff at the time of the publication of the article in question."

Plaintiff, appellant, contends:

"1. The court erred in charging the jury that defendant had a qualified privilege in publishing the libelous article.

"2. The court erred in charging the jury that the question of justification was one of fact to be determined by the jury.

"3. The court erred in refusing to charge the jury the only question for them to determine was the amount of damages.

"4. The court erred in permitting in evidence the editorial dated November 4, 1915, headed, 'Dr. Van Lonkhuyzen.'

"5. The court erred in charging that the subsequent publications could only be considered as bearing upon the question of malice and not upon the question of damages."

Plaintiff is a clergyman and at the time referred to was co-editor of a church paper called "De Wachter." In this paper, on June 16, 1915, appeared an article, written by him, entitled, "Playing with Fire." In an issue of the same paper of June 30, 1915, appeared a protest or petition to the President of the United States, drawn by plaintiff and another minister of the same church—Christian Reformed Church. The petition was not signed by plaintiff, who was an alien, but was circulated among members of the church in the United States, and a large number of signatures obtained. On July 2, 1915, defendant published the alleged defamatory article. Innuendoes

omitted, the article, as set out in the plaintiff's declaration, is as follows:

## " 'Playing with Fire.'

" ' "The dreadful world-war now waging, with its threat of involving us and with the very unhealthy upgrowth during the past 10 months of aggressive hyphenated Americanism in our own country has emphasized the need that we of this nation *shall become wholly united.* There should be no more hyphenated Americans. Each American of foreign birth or origin should show his good citizenship by being wholly and without reserve and without divided allegiance an American citizen and nothing else."

" 'portions of an article written by Theodore Roosevelt, the most distinguished of American citizens of Dutch extraction.

" 'It is to be sincerely and deeply regretted that a number of residents of Grand Rapids, of Holland origin, have signed a protest which is to go to President Wilson criticising him for the kind of diplomacy he has adopted in dealing with the question of German encroachments upon American commerce.

" 'They were led into this mares' nest of un-Americanism by the Rev. John Van Lonkhuyzen, pastor of the Alpine Avenue Christian Reformed Church. The Rev. John Van Lonkhuyzen is not an American citizen. He has lived in this country only four years and has not yet taken out his first naturalization papers, nor even signified his intention of so doing.

" 'In other words, hundreds of good American citizens have been led into a grievous error by an alien, who owes no allegiance whatever to the Stars and Stripes.

" 'All Americans of Holland parentage will be asked to sign the paper to be sent to President Wilson, which will criticise and seek to embarrass him, and which, at the same time, will reflect upon the good sense and patriotism of the entire Holland branch of our foreign born population.

" 'The petition, or protest, or whatever it may be, relates that the President's attitude of late is not entirely in accordance with the motive which directed him when he called for a day to be set apart for prayer. It asks that the exportation of arms be

stopped and that the investigation of the Lusitania incident be all-sided—inferring that the President has been biased.

" 'The protest rings throughout with dissatisfaction and doubt of President Wilson's motives.

" 'The whole muss was stirred up by the Rev. Mr. Van Lonkhuyzen in an article published in his church weekly, "The Wachter," entitled "Playing with Fire." The article deeply criticised the American press, and criticised the American people for announcing that they would stand behind the President in any step he might take, claiming that all the citizens might not stand behind the President. It stated that public opinion had been poisoned, that one-sided actions had been taken and one-sided policies pursued. Mr. Van Lonkhuyzen, in closing his incendiary article, said:

" ' "It is highly necessary, therefore, that a powerful protest be brought against this one-sidedness and this stirring up of public opinion towards one side. We should prevent worse things than these while it is yet in our power."

" 'The News was somewhat amazed to find what virtually amounts to sedition in Grand Rapids. The first thing to do was to investigate the source. Consequently The News telephoned Mr. Van Lonkhuyzen, to find out his exact status.

" ' "Are you an American citizen, a naturalized American?" was asked.

" ' "No, I am not an American citizen. I have never been naturalized," he replied.

" ' "Have you taken out your first naturalization papers?"

" ' "No. I have not taken them out yet."

" ' "Do you intend to become a citizen of the United States, and do you intend making application for your first papers."

" ' "Yes, I intend to take out my first papers in the near future."

" ' "How long have you resided in the United States?"

" ' "Four years. If any more inquiries come to your office, tell them I intend to become a citizen in the near future."

" 'Another alien, much more famous and able than Mr. Van Lonkhuyzen, came over here a short time ago. His name was Dernburg, and he attempted to do some criticising of the manner in which our gov-

ernment was being conducted. It was hinted to him that his presence in this country was undesirable, and he took the hint and departed for foreign shores.

" 'Evidently all the foreign meddlers did not take advantage of this rather forcible lesson. Maybe Mr. Van Lonkhuyzen never heard about it, there seems to be so much that he doesn't understand.

" 'So far as Mr. Van Lonkhuyzen is concerned personally, it makes no difference, but the pity of the thing is that probably thousands of good, loyal Americans of Holland descent are putting themselves into a false light by signing the petitions criticising our President and doubting the sincerity of his motives.

" 'The fact that the first organized criticism of President Wilson should emanate from Grand Rapids is no credit to the city.

" 'We are ashamed of the petitions and we are ashamed of the Rev. John Van Lonkhuyzen, or, rather, we are ashamed of the fact that he should live here.

" 'As he is an alien and nobody knows what fish he has to fry, it would seem that he should be the recipient of one of the famous hints from headquarters such as caused Dr. Dernburg to take his hat and go back home.

" 'We do not want trouble makers in America, whether they be English, French, Dutch, German or Japanese. The United States is today made up of a citizenry that is standing solidly behind President Wilson in his determination to protect our national honor. The Holland people have stood behind him until this plague of sedition broke out in the vicinity of Alpine avenue a few days ago.

" 'Those who have signed these protests will be sorry for what they have done. Perhaps many of them signed without thinking. That is the most charitable view of the case to take. If the protests have not been forwarded to the President, they should be thrown into the fire.

" 'The protest is a reflection upon the patriotism of every man who signs it. There has never been any reason to doubt the loyalty of American citizens of Holland birth. There should never be any reason.

" 'The Rev. Mr. Van Lonkhuyzen is an interloper, a meddler, and a spreader of distrust, discontent and

sedition. His protest against the "one-sidedness" of America's policy of dealing with its foreign affairs should entitle him to an invitation to pack his grip and go back to Europe where he belongs.

" 'If the petition, or protest, ever does reach the President, the News will make sure that Mr. Wilson will receive it in the full knowledge that it originated in the brain of a busy-body alien and that it does not represent the opinions of the loyal people of Grand Rapids, be they natives or of Holland birth or extraction.' "

The article in "De Wachter" and the petition to the President, which it is claimed by defendant caused and justified the alleged libelous editorial which it published, are here set out as pleaded by defendant:

## " 'Playing with Fire.'

" 'Playing with fire—that is what the attitude of the American Press toward the war may well be termed. We see this, too, in Italy what the result is when passions are whipped up and gain the mastery. There the people do not rule but the government rules, although it be in the form of a constitutional monarchy. That government and thereby the nation was for many years bound by treaty with Germany and Austria. That nation under the alliance has grown great. It had enjoyed all the advantages. Just recently had it received a free hand, without right, to claim and take a part of Turkey in Africa. It mixed, with Germany's support in so doing a bitter drop in the cup of England and France, both having power and influence in the Mediterranean Sea and on the coast of Africa. Now, in the hour of danger, she reverses her position. With a faithlessness rarely found in history, Italy now, in this war of nations, throws her force against her allies who helped to make her great. Where is now the confidence and faith in one another. Moreover, bribed by a nation whose mouth is filled with Germany's violation of treaties, and says, note well, and says that therefore she declared war upon Germany.

" 'And what is the origin of all this in Italy? In a great measure, through the same means used here to

fire the passions. The public press in Italy played continually upon the hatred against Austria. The government did not desire war. But finally it was obliged to yield before the storm. Otherwise (so constantly was the threat) there would be revolution and barricades erected. It was uttered publicly. It hissed members of the Royal Family publicly on the street. It wished to and should fight, and although Austria yielded nearly all that Italy could by means of a few victories have desired. And the war is on. Thousands shall fall and Italian hotheadedness shall be cooled in blood.

" 'Well, now, America and the American press should use this experience as a mirror. What the result is when once war passions are become overwhelming. And America with all her varying nationalities may well be doubly careful. Since the Lusitania disaster one can see how among so peaceful a nation as the American the tendency is. What a one-sided presentation, to but express it mildly. What an overwhelming of the government and an assurance to the President that he take strong measures knowing the whole people are behind him, although this last might have an entirely different result. See, thus are wars made. Instead of seeing the matter from both sides and being careful, we arouse ourselves and the people, although there was in this instance plenty of reason to speak more mildly. What were the people doing on a boat loaded with ammunition sailing under an unfriendly flag in the war zone? They could just as well have been sitting on an ammunition wagon on the firing line. Far-reaching recklessness. And they would have us look surprised when everything blows up into the air. And from England, naturally, there is just the selfsame treachery as during the Boer war, whereby the wives and children of the Boers were placed before English cannon, to which the Calvinist referred to recently. But to all that we are blind, as also that if England shall accomplish her intentions, hundreds of thousands of women and children in Germany abiding in hopelessness shall die of starvation. About this cruelty which it has not been able to accomplish, but for which it is still striving, naturally nothing is said. Nor do we speak of the brutality

that we are not on account of patriotism, but only for a handful of gold manufacturing ammunition and all kinds of war materials by which the war is continued and thousands, and yet thousands are killed. Killed by American tools in a war in which America has no concern. For a handful of gold do these American citizens permit themselves to be used as murderers and at the same time with their mouths full of the brotherhood of men!

" 'And all this because the public is weak and poisoned and permits itself to be more and more aroused by the press. More and more one-sided sympathy is being nurtured, and from it one-sided acts result which mock all so-called neutrality, so that before we know it, we too shall sit in the midst of war.

" 'It is high time, therefore, that mighty protest be made against this one-sidedness and this whipping up of public sentiment to one side. So that something worse may not overcome us.

" 'Perhaps it would not be bad if such a protest went out from the thousands of descendants of the Holland nation, a nation which up to this time, although lying in the midst of the storm of the peoples engaged in the war, yet through God's goodness knows how to keep itself so wonderfully out of the war. We have a right to speak with the rest.

" 'Remembering your laudable appeal to the people for a day of prayer for the restoration of peace in Europe and a day of humiliation of ourselves before God Almighty that peace may be continued in our own country;

" 'We American citizens, believe that America's attitude of late is not entirely in accordance with the noble motive which directed you when you set apart the mentioned day of prayer and humiliation, because;

" 'Munitions and other instruments of warfare are sold in large quantities to one side of the belligerent nations; the public press is inciting public opinion of America against our fellow-men and spreading feelings of hatred towards a friendly nation; the Lusitania incident—however much we too deplore the loss of so many lives—is issued one-sidedly; besides other questions the fact does not seem to be taken into consideration that English merchantmen are said to be instructed to ram submarines and are rewarded for

accomplishing such; that in this way the submarines are prevented from investigating a hostile vessel; that merchantmen also are really used as instruments of warfare; not to say that a Christian nation as America may not allow the plans of the starving of millions of innocents by a nation befriended to us.

" 'We therefore earnestly ask you to use your power to do everything possible that the feelings of prayer and humiliation set forth by your note of November, 1914, may continue in our nation, that exportation of ammunition and instruments of warfare may be prohibited, the propagation of hostile utterances in public life be restricted, the investigation of the Lusitania incident be allsided, and the dealing with other nations be done in the spirit of peace.

" 'We, American citizens of Holland descent, beg to be allowed to submit the above to your consideration. We do so the more freely as descendants of a neutral people.

" 'Most faithfully and respectfully.' "

The learned trial judge instructed the jury that the particular language used by defendant was in and of itself libelous and, unless privileged, implies both damage and malice, and upon the subject of privilege, entered into at length in the charge, said, among other things, after reviewing the alleged libelous article, that the comments and conclusions relate to public matters—

"and, therefore, constitute a qualified privilege, according, as you may determine the question as to whether or not there was express malice in publishing them";

—and said that the burden rested upon plaintiff to prove express malice. Upon the subject of justification, the jury was told:

"It is for you to say under the evidence in the case whether the limits of fair criticism were transcended by the defendant company under the facts and circumstances disclosed by the testimony in this case.

"It is for you to say whether the defendant com-

pany was justified in publishing the alleged libelous article by reason of what had gone before, including the conduct of the plaintiff, as disclosed by the evidence."

OSTRANDER, C. J. (*after stating the facts*). The considerable reference which has been made in the foregoing statements to the points presented upon the former appeal and to the opinion delivered is made partly because of the use made in the briefs and in the opinion of the words justified and justifiable, partly to show the theories of counsel presented on the first appeal, and partly because it is a contention now made by counsel for plaintiff that this court, by its opinion, left to be determined upon a new trial (upon the same facts) only the question of damages, while the counsel for defendant say that the trial court correctly read the opinion as holding that on a new trial the questions directed to be submitted to the jury were:

(1) "Whether or not the limits of fair criticism have been transcended," and
(2) "The question of justification."

It is clear that the article complained about is either a libel (actionable defamation), or it is fair comment. Plaintiff says it is actionable defamation; defendant, in substance and effect, that it is fair comment. The lower court, upon the first trial, held that the article was not libelous, and then, and illogically, if the term justified is used with its technical meaning, that the defendant was justified in publishing the article. This court held (1) that the words employed were libelous, and (2) that whether they were justified—excused, warranted—because they were fair comment, was a question for the jury. Unless we did then, and do now, wholly misapprehend the case presented by the pleadings and the proofs, then, allegations of minor

errors aside, no other points of law were then, or are now, involved in a proper determination of the main question presented by the record. No separate question of justification or of privilege, giving these words their technical meaning, is presented, and we do not read the notice, given by defendant, of special defenses as raising these questions; we do read it as presenting, with the plea of the general issue, the contentions that the language is not libelous and, if it is, that all that was published was fair comment and therefore not actionable.

Plaintiff cannot be heard to say that what he himself published and circulated was not matter of public interest, because he addressed the public upon a matter of current public concern, criticising action of public officials and advocating certain action of public officials. What he published therefore invited, or at any rate excused, comment and criticism from those who held other views. Plaintiff, however, is not a public officer, nor a candidate for office, but is a person who had the legal right to frame and circulate a petition to the President of the United States, and to comment, fairly, upon governmental policies and actions. Good taste might well have influenced him, in view of his status, to omit the particular activity, and his status, if known, would be likely to qualify his arguments; but his legal right cannot be denied. Defendant commented upon and criticised what plaintiff had published and criticised his political activity, and in doing so used language about him personally which we held, and now hold, to be libelous *per se;* of such a character as to require the court to advise the jury that unless defendant's contention that it was fair comment was made out it imputed malice and injury.

The *onus* is on plaintiff, where a defense of fair comment is raised, just as in any other case, to show

that the words are reasonably capable of being understood as a libel on him, and it is for the judge to say whether the published article is capable in law of being a libel, *McQuire* v. *Western Morning News Co.,* L. R. 2 K. B. Div. (1903) 100, 111, and the court having determined this point favorably to the plaintiff, then whether the words complained of are, or are not, fair comment is essentially a question for the jury. *Campbell* v. *Spottiswoode,* 3 B. & S. 778, 32 L. J. R. Q. B. 185; *Merivale* v. *Carson,* L. R. 20 Q. B. Div. 275.

"Fair comment does not negative defamation, but establishes a defense to any right of action founded on defamation." Per Buckley, L. J., in *Walker & Son* v. *Hodgson,* L. R. 1 K. B. Div. (1909) 239, 253.

"It is precisely where the criticism would otherwise be actionable as a libel that the defense of fair comment comes in." Per Lord Loreburn, L. C., in *Dakhyl* v. *Labouchere,* L. R. 2 K. B. Div. (1908) 325, 327.

See *Cooper* v. *Stone,* 24 Wend. (N. Y.) 434; *Dowling* v. *Livingstone,* 108 Mich. 321 (32 L. R. A. 104); Newell on Slander and Libel (3d Ed.), chap. 20, p. 686 *et seq.*; Fraser's Law of Libel and Slander (5th Ed.), art. 24, p. 155 *et seq.*

In making the defense of fair comment, defendant had no benefit of privilege, in the sense in which the learned trial judge used the term in advising the jury; no privilege attaches to a newspaper in such a case, and the liberty of the press, unless affected by statute, is no greater and no less than the liberty of every citizen. *McAllister* v. *Free Press Co.,* 76 Mich. 338; *Bee Pub. Co.* v. *Shields,* 68 Neb. 750 (94 N. W. 1029, 99 N. W. 822). Although some eminent judges have used the word "privilege" to describe the public right of fair comment (Gray, C. J., in *Gott* v. *Pulsifer,* 122 Mass. 235, 238, 239), *bona fide* comments on matters of public interest are not privileged; because it is the right of every one, not the privilege of any particular

one, to comment fairly and honestly on any matter of public interest, and the defense of fair comment is equally applicable whether the criticism be oral or written.   One distinction between fair comment and privileged communications is that in the latter case the words may be defamatory, but the defamation excused or justified by reason of the occasion, while in the former case the words are not defamation of the plaintiff and hence not' libelous, the stricture is not upon the person himself but upon his work—upon what he has said or has written. Another distinction is that if criticism or comment is privileged, strictly, the plaintiff would in every case be required to prove actual malice, however false and however injurious the strictures, while the defendant would only have to prove that he honestly believed the charges he made; and this is not the law.

Clearly, the court was in error in instructing the jury that there was involved any question of qualified privilege, in the sense in which the court used the term, and in advising them that plaintiff must prove express malice in order to recover.   Quite as clearly, the court was not in error in refusing to charge, as requested to do by the plaintiff, that the only question for the jury was the damages sustained by the plaintiff.   The jury should have been instructed that the article in question is libelous unless it is fair comment, and that whether or not it is fair comment was for them to decide, under instructions to be given them.   If it was fair comment, plaintiff could not recover; if it was not, the rules to be applied in respect to the measure of recovery are those applicable to any other case of libel.

In view of the foregoing, it seems to us unnecessary to consider further and comment upon the charge of the court.   However, it perhaps ought to be said that evidence of repetition of the libel before suit was

begun may be received in aggravation of damages, and repetition after suit begun and after a first trial may be proved as evidence of malice if the publication is not found to be, in fact, fair comment.

It was error to admit in evidence the article—editorial—headed, "Dr. Van Lonkhuyzen," printed on November 4, 1915, after the first trial of the cause was ended in the circuit court. It was offered and received as tending to rebut malice. The editorial reads:

"Dr. Van Lonkhuyzen.

"You have declared before our magistrates your intention of becoming an American citizen. It is no reflection upon your character, your intelligence nor upon your ideals that in your four years of residence in the United States you have not as yet been able to grasp the spirit of American patriotism in all its depths and fullness. You cannot understand in its entirety the American spirit until you become thoroughly imbued with it. You cannot understand the blessings of American citizenship until you have shared in them. An American court has impressed you with some of these essentials.

"We will welcome you as a citizen of our free country, as we welcome all men with Christian ideals. We will welcome you as we welcomed all men of leadership and achievements. We will extend to you the hand of freedom's fellowship in the thought and hope that you, when instilled with that spirit which moves America, will lend your many excellent qualities, your unquestionable high character and your intellectual endowment to the forces that have made American citizenship what it is."

It is said by appellee that the plaintiff had offered to show malice, various publications appearing in defendant's newspaper after the publication of the alleged libel, and that this article is—

"only another article of the same class tending to show that the defendant was not actuated by personal ill will against the plaintiff."

It might have been argued by plaintiff's counsel, the article being in evidence, that it was a confession that the original editorial and its repetition were designed by defendant, not as fair comment upon what the plaintiff had written and published, but to teach plaintiff himself a lesson, to personally humiliate him. We are of opinion that the court erred in receiving it. It is not of the "same class" as those offered by plaintiff. If regarded as favorable to defendant, it is self-serving evidence made by defendant in its own behalf.

The judgment is reversed and a new trial ordered, with costs to appellant.

BIRD, MOORE, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.