# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

R. A. JAMES, JR. V. C. H. HAYMES.

January 17, 1935.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Browning and Chinn, JJ.

The opinion states the case.

*Harris, Harvey & Brown,* for the plaintiff in error.

*N. E. Clement, H. T. Clement* and *C. R. Warren,* for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

Plaintiff obtained a verdict and judgment in the sum of $4,500 against defendant, which on a writ of error to this court was reversed. On the second trial there was a verdict and judgment in favor of plaintiff for $5,000. From that judgment this writ of error was awarded defendant.

It was held in the former opinion, *James* v. *Haymes,* 160 Va. 253, 168 S. E. 333, 335, that the publication, on which the action for defamation was based, dealt with a question of vital concern to the public and that defendant had a right to make fair and reasonable comments thereon, but that this right did not entitle defendant to make false statements of fact, or to exceed the limits of fair and reasonable criticism.

Plaintiff on the first trial sought and obtained instructions authorizing the jury to assess punitive damages. We held that the giving of these instructions was error, and in reversing the case contemplated that on another trial the court would instruct the jury that as a matter of law the publication discussed a subject of public concern, and that plaintiff's right to recover would be submitted to them on two material issues—(1) Whether the facts on which the editorial was based were true or untrue; and (2) If true, whether the censure of plaintiff's work on the road exceeded the limits of fair and reasonable criticism.

The instructions[1] given on the second trial for plaintiff over defendant's objection, omitted these pertinent principles, and submitted the case to the jury as if the publica-

---

[1] "1. The court instructs the jury that when the defendant pleads justification the burden is on him to prove by a preponderance of the evidence all facts set out in the said plea, that is relevant to the issue, in its entirety, and if he fails to do so, then his justification fails in toto."

"3. The court further instructs the jury that a libel may be in the form of an insinuation as well as of positive assertion and it is not

tion dealt with a subject of no public concern and as if plaintiff were engaged in work upon a private structure. This error in the instructions is not cured by correct instructions given at the request of defendant. See *Chesapeake Ferry Co.* v. *Hudgins,* 155 Va. 874, 156 S. E. 429; *Reliance Life Ins. Co.* v. *Gulley's Adm'x,* 134 Va. 468, 114 S. E. 551.

Having reached the conclusion that all instructions given for plaintiff are erroneous, it becomes our duty to determine whether the evidence in the record will sustain any finding for plaintiff. Before discussing that question, it seems appropriate, at this stage, to settle another point raised in defendant's brief.

Defendant challenges the soundness of the majority rule stated in the former opinion: "* * * that if the facts upon which the comment or criticism sought to be excused do not exist, the foundation fails." While defendant admits that this rule was restated and followed in *Williams Printing Co.* v. *Saunders,* 113 Va. 156, 73 S. E. 472, Ann. Cas. 1913E, 693, he contends that it has been modified and overruled in *Rosenberg* v. *Mason,* 157 Va. 215, 160 S. E. 190. That case involved an action by a discharged employee against her former employer for slander and insulting words. It was proven that at the time the employer discharged the employee the slanderous words were uttered and explained the reason for the discharge. The decision turned on the admission of evidence which showed probable cause and good faith of defendant. It was held that in the absence of a plea of truth and on pleas of privilege and not guilty the

necessary that a positive assertion be made to make the publication a libel."

"4. The court instructs the jury that defamatory words falsely written of a person which impute to the party unfitness to perform the duties of an employment of profits, or want of integrity in the discharge of the duties of such employment are libelous *per se;* and that defamatory words falsely written of a party which prejudices such party in his profession or trade are libelous *per se.*"

"6. The court instructs the jury that the defendant, R. A. James, Jr., through the columns of his newspaper, the Danville Daily and Sunday Register, has no peculiar privilege, but is liable for defamatory and libelous statements which he publishes, in the same manner as any other individual person, and that defendant, R. A. James, Jr., cannot libel plaintiff through the columns of his newspaper and then

evidence was admissible, even though tending to prove the truth of the defamatory words used. That case came squarely within the definition of privilege announced by Lord Campbell in *Harrison* v. *Bush* (1855), 5 El. & Bl. 344, 119 Eng. Reprint, 509, 25 L. J. Q. B. N. S. 25, 1 Jr. N. S. 846, 3 Week. Rep. 474, as follows:

"A communication made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged, if made to a person having a corresponding interest or duty, although it contain criminatory matter which, without this privilege, would be slanderous and actionable"; to which he added: " 'Duty,' in the proposed canon, cannot be confined to legal duties which may be enforced by indictment, action or mandamus, but must include moral and social duties of imperfect obligation." See Townshend on Slander & Libel (4th Ed.), sec. 209; L. R. A. 1918E, 43.

■■ It has long been the settled law in this jurisdiction that in cases falling within the above class, plaintiff, in order to recover, must prove one of two things: (1) That the scope of the privilege of the occasion has been exceeded, or (2) that the words were uttered with actual malice. The question at bar involves the privilege, as that term is loosely used, to make fair comment and criticism on a subject of public concern. There is a distinction between the two classes of cases. A privileged occasion, as pointed out in the former opinion, strictly speaking, is confined to an occasion in which the party using the language of which com-

come into court and absolve himself from libel to plaintiff by saying he meant no malice and has no malice or illwill against plaintiff and was not actuated by malice; that he is liable in compensatory damages for whatever his employee or agent may have done in that respect, but lack of actual malice or illwill may be considered in mitigation of damages."

"10. The court instructs the jury that if they believe from a preponderance of the evidence that the defendant, Mr. R. A. James, published in his newspaper, The Danville Register, the article in question, and that such article falsely implies, imputes and accuses the plaintiff, Mr. Haymes, of conduct which is injurious to his character, reputation and standing as a contractor and business man, such article is libelous *per se* (that is to say that the article is libelous and damaging in itself and the law presumes damages to result from the pub-

plaint is made had communicated the same to another party to whom he owes a duty. That is, the occasion is such that one or more members of the public are clothed with greater immunity than others.

The privilege or right of a citizen to comment on matters of public concern is based upon a sound public policy, *i. e.*, the public should be informed of the character, qualifications, actions, and conduct of public officers and candidates for public offices, and other matters of public nature, such as the erection of public buildings and the construction of highways. The comment or criticism in such cases may reflect upon the plaintiff in his public actions or conduct; indeed, he would not complain unless they tended in some degree to defame or ridicule him. Sound public policy requires that immunity should be granted to newspapers and other citizens in the discussion of public affairs and where the comment or stricture is based upon established facts, an action does not lie unless there is proof of actual malice, or the language used so exceeds reasonable limits that malice may be inferred therefrom. Mr. Justice Holmes, in *Burt* v. *Advertiser Newspaper Co.,* 154 Mass. 238, 28 N. E. 1, 4, 13 L. R. A. 97, held that criticism and not statement of fact is protected, as follows:

"But there is an important distinction to be noticed between the so-called privilege of fair criticism upon matters of public interest and the privilege existing in the case, for instance, of answers to inquiries about the character of a servant. In the latter case a *bona fide* statement not in

lication of such an article), and it is not the duty of Mr. Haymes to prove that he has suffered damages; and further the jury is instructed by the court that if they believe the article in question to be libelous *per se,* then they shall find their verdict for the plaintiff, and they shall fix compensatory damages at such sum as they deem just, not to exceed $50,000.00, the amount claimed in the notice, and in fixing the amount of damages they may take into consideration damage to his business, the humiliation and mental suffering, the extent of the circulation of the newspaper and the condition surrounding the publication of the article, the language in which the imputations in the article are expressed and the nature and effect of the charges, the probable effect upon those to whose attention the editorial was called, and his standing in his community."

excess of the occasion is privileged although it turns out to be false. In the former what is privileged, if that is the proper term, is criticism, not statement, and however it might be if a person merely quoted or referred to a statement as made by others, and gave it no new sanction, if he takes it upon himself in his own person to allege facts otherwise libelous, he will not be privileged if those facts are not true. The reason for the distinction lies in the different nature and degree of the exigency and of the damage in the two cases. In these, as in many other instances, the law has to draw a line between conflicting interests both intrinsically meritorious. When private inquiries are made about a private person, a servant for example, it is often impossible to answer them properly without stating facts, and those who settled the law thought it more important to preserve a reasonable freedom in giving necessary information than to insure people against occasional unintended injustice, confined, as it generally is, to one or two persons. But what the interest of private citizens in public matters requires is freedom of discussion rather than of statement. Moreover, the statements about such matters which come before the courts are generally public statements, where the harm done by a falsehood is much greater than in the other case."

Mr. Justice Taft, in *Post Pub. Co.* v. *Hallam,* 59 Fed. 530, 540, 8 C. C. A. 201, 16 U. S. App. 613, said: "The existence and extent of privilege in communications are determined by balancing the needs and good of society against the right of an individual to enjoy a good reputation when he has done nothing which ought to injure it. The privilege should always cease where the sacrifice of the individual right becomes so great that the public good derived from it is outweighed. Where conditional privilege is extended to cover a statement of disgraceful fact to a master concerning a servant or one applying for service, the privilege covers a *bona fide* statement, on reasonable ground, to the master only, and the injury done to the servant's reputation is with the master only. This is the extent of the sacrifice which

the rule compels the servant to suffer in what was thought to be, when the rule became law, a most important interest of society. But, if the privilege is to extend to cases like that at bar, then a man who offers himself as a candidate must submit uncomplainingly to the loss of his reputation, not with a single person or a small class of persons, but with every member of the public, whenever an untrue charge of disgraceful conduct is made against him, if only his accuser honestly believes the charge upon reasonable ground. We think that not only is such a sacrifice not required of everyone who consents to become a candidate for office, but that to sanction such a doctrine would do the public more harm than good. We are aware that public officers and candidates for public office are often corrupt, when it is impossible to make legal proof thereof, and of course it would be well if the public could be given to know, in such a case, what lies hidden by concealment and perjury from judicial investigation. But the danger that honorable and worthy men may be driven from politics and public service by allowing too great latitude in attacks upon their characters outweighs any benefit that might occasionally accrue to the public from charges of corruption that are true in fact, but are incapable of legal proof."

In *Van Lonkhuyzen* v. *Daily News Co.*, 203 Mich. 570, 170 N. W. 93, 99, this is said: "Another distinction is that if criticism or comment is privileged, strictly, the plaintiff would in every case be required to prove actual malice, however false and however injurious the strictures, while the defendant would only have to prove that he honestly believed the charges he made; and this is not the law."

Lord Buckley, in *Peter Walker & Sons, Ltd.* v. *Hodgson,* 1 K. B. (1909) 239, 253, expresses the English view thus: "Upon the plea of fair comment the substratum must, I think, upon the authorities, be laid by shewing that, notwithstanding that the words are defamatory, yet the facts upon which the comment is based were truly stated, and. that the comment was honest and was not without foundation. Fair comment does not negative defamation, but

establishes a defense to any right of action founded on defamation. To succeed upon the plea of justification the defendant must prove not only that the facts were truly stated, but also that the innuendo is true. He must justify every injurious imputation. Upon fair comment, however, if it be established that the facts stated are true, the defense of fair comment will succeed even if the imputation or innuendo be not justified as true, but be fair and *bona fide* comment upon a matter of public interest."

The defendant, to sustain his position, cites and mainly relies on *Bearce* v. *Bass*, 88 Me. 521, 34 A. 411, 51 Am. St. Rep. 446. That part of the opinion quoted in his brief was explained and modified by the same court in *Pattangall* v. *Mooers*, 113 Me. 412, 94 A. 561, 564, L. R. A. 1918E, 14, 19 Ann. Cas. 1917D, 689, in the following language: "We do not think that statement of the rule of qualified privilege was intended by the learned justice who wrote that opinion to be interpreted so as to include as privileged communications false charges against a candidate for office of crimes, or of specific acts of dishonesty in his business or profession, or false accusations affecting his private character, even where the other elements of privilege are shown. If such is the necessary interpretation of the language there used, then we think it should be modified somewhat * * * We are constrained to the conclusion that the law does not justify anyone in publishing a false charge of specific acts of culpable dishonesty against a candidate for office which directly tends to injure him in his profession and occupation; or to defame his reputation for honesty and integrity. That conclusion accords with reason and the great weight of judicial precedent."

For additional authorities, see note L. R. A. 1918E, 21, and note 50 A. L. R. 339; 36 C. J. 1283.

It is claimed that the editorial in the main is based upon two statements of facts: (1) That plaintiff previous to the year of the publication had built under contract with the Highway Commission a part of the main highway between Chatham and Danville and had failed to complete the work

within the time specified in the contract. (2) That in June, 1930, he was engaged in building a part of the same highway and was doing slow work, or making slow progress with the work.

The former record shows that the plaintiff admitted the delay in the completion of the work on his first project but claimed that it was due to no dereliction on his part. At the time of the first trial there was a dispute between him and the Highway Commission as to whether or not he was responsible for the delay. On the second trial it was conclusively established that the contract required the work to be completed on November 1, 1929, and it was not completed until May 10, 1930; that the Highway Commission on account of unfavorable weather conditions ordered him to suspend work from January 6th to April 6, 1930.

While the Commission at first charged him with delay, totaling eighty-six days, not including Sundays and holidays, on a re-hearing it finally decided to hold him responsible for forty-one days only, and he accepted that settlement by paying $410. So whatever may have been the reason for the delay, it was clearly established that the road was not completed for six months and ten days after the date on which plaintiff had agreed to finish it. Hence, the truth of the first statement of fact on which the editorial was based was clearly established in the second trial.

The other alleged statement of fact is really an opinion stated somewhat as a fact. While the headlines were in these words: "Slow Work on the Chatham Road," the body of the editorial read: "The contractor on the Chatham road is doing such slow work that it seems hardly possible that he can complete the road in time to have the road ready for tobacco season." The concluding part of the sentence is an opinion based on another opinion that the contractor on the date of the editorial was doing slow work.

The meaning is clear, namely, that the editor was of the opinion that the road would not be completed in time for the opening of the tobacco market. This opinion was based on the fact that the same contractor had not completed his

former undertaking in contract time and judging by the amount of work already done, and that remaining to be done, he would not complete the present undertaking in the time specified.

The evidence shows that on February 28, 1930, plaintiff made another contract with the Highway Commission whereby he agreed to construct a part of the same highway from Chatham to Danville to be completed by September 1, 1930. For some reason, not explained in the record, the Commission did not authorize him to begin work until March 25th. On the date the article was written, June 15, 1930, the work on this highway and the question whether or not it would be completed in time for the opening of the tobacco market in Danville, was a subject of general discussion in the community.

The senior resident engineer of the United States Bureau of Public Roads in charge of the Federal Highway construction in Virginia, testified that his reports based on personal inspection showed the plaintiff was making slow progress in building the road. This statement was based on reports made on May 29th, June 28th, and July 22nd.

Mr. Mullen, supervising engineer for Virginia, testified that his report on this project, dated June 1st, showed: Cost eighteen per centum, time twenty-six per centum; work twenty per centum; July 1st, cost forty-five per centum, time forty-eight per centum, work forty per centum; July 31st, cost fifty per centum, time seventy-three per centum, work sixty per centum; and that while there was a slight variation between the costs and the time consumed the reports in his opinion revealed normal progress and he had so advised the Chairman of the Highway Commission.

The evidence on the subject is conflicting, but the general opinion in the community, and the one held by the editor when he wrote the editorial, was that the contractor was making slow progress in building the road. This was the same opinion held and expressed by plaintiff himself. In a letter to the Highway Commission he stated: "The question of when the road will be finished has to be answered by

us a number of times daily and we invariably answer it by saying we hope to complete the road about October 1st."

On cross examination he stated that he told a large number of people that the road would not be completed before October 1st. He said that he regarded these inquiries as casual because, "I didn't think that it really concerned anybody except the Highway Department and myself." This statement shows that plaintiff entirely overlooked the fact that he was erecting a structure for the public and he was receiving his compensation from taxpayers. We assume that plaintiff was expressing an honest opinion when he said that the road would not be completed before October 1st, thirty days later than the time specified in his contract. Such being the fact, plaintiff cannot complain if the court holds that defendant was justified in forming and expressing the same opinion. Wigmore on Evidence (2d Ed.) sec. 2590, 1934 Supplement, note 2594a.

A slight, immaterial, unintentional, misstatement should be disregarded. Newell on Slander and Libel (4th Ed.) 523 expresses the principle thus:

"Slight unintentional errors, however, will be excused. If a writer in the course of temperate and legitimate criticism falls into error as to some detail, or draws an incorrect inference from the facts before him, and thus goes beyond the limits of strict truth, such inaccuracies will not cause judgment to go against him, if the jury are satisfied, after reading the whole publication, that it was written honestly, fairly and with regard to what truth and justice require. 'It is not to be expected that a public journalist will always be infallible.' "

Plaintiff further contends, in effect, that a news item which appeared in the Danville Register on June 25th, ten days after the date of the editorial, estops defendant from asserting that the work on the road was progressing slowly. This publication is as follows:

"CHATHAM ROAD TO BE OPEN IN SEPT.—WORK WILL BE COMPLETED IN TIME FOR OPENING OF LOCAL TOBACCO MART.

"Because of the fear which has been prevalent among

tobacco growers of Pittsylvania county that the work on the Chatham highway would not be completed in time for the opening of the Danville tobacco market, Senator W. A. Garrett and Delegate Maitland Bustard recently called upon H. C. Shirley, State Highway Commissioner in Richmond to discuss the situation and prevail upon the Commission to rush the work to completion. They were promised every cooperation in speeding the work. An engineer of the Highway Department was sent to make a check on the progress being made. It was found that the Haymes Construction Company, which is doing the work was up to schedule, and that the road will be finished by September 1st, a month before the opening of the Danville market is scheduled."

We do not think this contention is sound. The article purports to be the result of an interview between two well-known citizens of the community and the Highway Commission, and the conclusion reached by them was different from the opinion formerly expressed both by the editor and the plaintiff. It dealt with the same matter of public concern, contains no censure of plaintiff and certainly is strong evidence tending to prove that defendant was actuated by no malice in publishing either the editorial or the news item.

"When a person is in a public capacity he may be criticized by the newspapers in the public interest; and that rebuts the presumption of malice in law which the court might otherwise make, and leaves malice in fact to be proved, and malice in fact to be found, either in the special language of the article or in circumstances proved which point to some motive of enmity to the particular individual." *John Long & Co.* v. *Langlands*, 114 L. T. N. S. (Eng.) 665.

Even if the assertion: "Contractor * * * is doing such slow work * * *," be regarded as a statement of fact and untrue, the mere statement itself is not defamatory, and, in the absence of proof of special damages, does not constitute a cause of action against defendant. After further deliberation on the question, we have reached the con-

clusion that the rights of an individual engaged in public service or *quasi* public service would not be unduly impaired and the public interest advanced by the adoption of the following rule: When a publication deals with a matter of public concern and the false statements of facts on which the publication is based are not defamatory *per se,* that defendant made the statements published for a proper purpose, in good faith and had probable cause to believe, and did believe they were true, he will not be held liable even though their falsity is subsequently established; provided of course that the comment or censure does not exceed the limits of fair and reasonable inference drawn from the facts stated. This rule does not conflict with the holding in *Williams Printing Co.* v. *Saunders, supra,* in which case the false statements of alleged facts were defamatory *per se.*

Applying either of these rules, the defendant is relieved of any liability for the statement of facts on which the editorial was based. The next question is, Does the censure of plaintiff in his work transcend the limits of fair and reasonable comment? Unquestionably, the users of the highway had suffered great inconvenience during the winter before, because of the fact that it had not been completed within the time specified in the contract. They were fearful that the same conditions would exist in the fall and winter of 1930 and 1931. The censure was not directed at plaintiff alone. It included both plaintiff in his conduct of the work and the Highway Commission for permitting the delay in completing the building of the road. There was no extrinsic evidence of actual malice nor under all of the facts in the record would a jury be justified, even if the issue were presented to them under proper instructions, in finding malice from the language used. Not only that, but this case as now presented clearly shows the beneficial effect public discussion has upon public service. After the publication of the editorial and the public discussion of the subject among the citizens of the community, two members of the General Assembly took the matter up with the Highway Commission and received assurance from that body that it

would expedite, as much as possible, the completion of this part of the highway.

The district engineer immediately called for a report from the resident engineer who stated that he had spent some time on the project and had discussed the subject with plaintiff, and that while plaintiff was "still grumbling every once in a while," he was putting forth every effort to complete the work on time.

As late as July 2, 1930, the resident engineer wrote plaintiff the following letter:

"14            577-C
                              "Danville, Virginia
                              "July 2, 1930.

"HAYMES CONSTRUCTION CO.
"Chatham, Virginia

"Gentlemen:

"After very much consideration on my part relative to approximate date for completion of your project I have come to the conclusion that it will be absolutely necessary for you to continue laying base from stations approximately 355x00 to the end of your project. As you already know it is very essential to have this section of road completed by tobacco season time in this community and in my judgment if you do not continue to lay your actual base course along at the same time you are laying bituminous top there is no possible chance for your project to be completed by October 1.

"I am hereby giving you notice that unless you have additional equipment on job and are actually starting to lay base between above sections mentioned by the 14th day of July further action will be taken in this matter. I would appreciate your co-operation with the department in your progress as I see no possible chance for this project to be completed anywhere near on time unless this is done.

                    "Very truly yours,

"MSD/MWS            M. D. DE HUFF, Res. Engineer.

"Started base July 17th
(Pencilled notation on letter)
"Copy to Mr. C. B. Leech, Jr. Dist. Eng.
"Copy to Mr. V. Von Gimmengen, Inspector."

The last paragraph threatens plaintiff with cancellation of his contract unless the suggestions of the Highway Commission are followed. Plaintiff admitted that he complied with these suggestions but denied that this fact necessitated any change in his plan or schedule for the work. The fact remains, that while on the approximate date of the editorial, plaintiff was of the opinion, and so informed the public, that he would not complete the road before October 1st, he did complete the same by September 1st and on September 13th the road was accepted by the Highway Commission. The fears of the traveling public were allayed, and the cause of maintaining inconvenient detours removed, due in some measure at least to more stringent supervision by the Highway Commission and the cooperation of plaintiff himself.

In the former opinion this court expressed serious doubt as to whether the evidence was sufficient to take the case to the jury, but resolved that doubt in favor of plaintiff. In remanding the case the court was influenced by the thought that perhaps there would be a further development of the evidence on the second trial, and to better attain the ends of justice we exercised our discretion and remanded the case instead of entering judgment then.

As we have heretofore said, this case will have to be reversed because of error in giving instructions; and it now becomes our duty under section 6365 of the Code to determine whether or not the facts before us (*i. e.,* the evidence) are such as to enable the court to enter final judgment upon the merits and whether it is reasonably clear that the ends of justice will be better attained by so doing. Upon examination of the record made in both the first and second trials we are of opinion that plaintiff has fully developed all the evidence which probably is available to him and an

end should be made of the case. Being of opinion that the great preponderance of the evidence is in favor of the defendant, final judgment will be here entered.

*Reversed and final judgment.*

CAMPBELL, C. J., and HOLT, J., dissenting:

As we view the evidence, it does not materially differ from the evidence on the first trial, and at that trial we in substance reached the conclusion that the evidence was sufficient to sustain a verdict for the plaintiff. We are firm in our view that there should be stability in the decisions of the court.

For these reasons we are constrained to dissent from the conclusion now reached that the evidence is not sufficient to sustain a verdict for the plaintiff.

EPES, J., concurring.

I fully agree with the conclusions of the court as stated in the last paragraph of its opinion; but there is a phase of the opinion in which I do not concur.

My view is that the general underlying principle upon which the statement quoted by the court from Newell on Slander and Libel (4th Ed.) 523, is of broader application than that given it either by the author or by the court in its opinion.

There are certain classes of information and degrees of proof that a statement of fact relating to the conduct or work of a public official, with which the public properly has a concern, is true, which a person or a newspaper is excusable for accepting and making the basis of a fair comment and criticism, even though it should ultimately turn out that the statement was not true, provided (1) that he honestly believes the fact stated to be true, (2) that he makes the statement and his comment and criticism based thereon without malice, and (3) that his comment and criticism would be fair were the fact upon which it is based true.

The newspaper or person is not an *insurer* of the truth of the facts stated by him. But he is an insurer that the information, upon which he bases his belief that the fact is true and acts in giving publicity to it, is such as to justify a prudent and careful man, acting with a high degree of good faith and a proper consideration for the rights and reputation of his fellow man, in giving publicity to the things stated by him as facts. The nature of the thing stated by him as a fact has a very material bearing upon the degree of proof or kind of information upon which a person is excusable for acting or giving publicity to it. For instance, one should be held to a higher degree of care where he states that a man has done something which is a heinous offense, than where he states that he had done something which constitutes only a minor, though reprehensible, dereliction of duty.

An example will make my meaning plainer. Suppose this case: The Auditor of Public Accounts has filed with the Governor an official audit of the financial transactions of an officer of the Commonwealth, in which it is stated that that officer had received $1,000 for which he was accountable but had not accounted. A newspaper, having had its representative examine the audit and honestly believing the facts therein stated to be true, without any actual malice whatever publishes an article stating that the officer had not accounted for all the moneys coming into his hands and should not for this reason be re-elected to office. However, it subsequently develops that the officer had in his possession vouchers showing the correct application of this $1,000; but the Auditor had improperly disallowed the expenditures shown thereby. The facts upon which the comment or criticism sought to be excused would not exist; but in my opinion the foundation for the defense of privilege of fair comment and criticism would not have failed. There would be sufficient basis for the statement to excuse the newspaper for making it and to constitute a complete defense to an action for libel.